THE CITY OF CHICAGO, Plaintiff-Appellee, *v.* STATE & MUNICIPAL TEAMSTERS *et al.*, Defendants-Appellants (State & Municipal Teamsters *et al.*, Plaintiffs-Appellants, *v.* Harold Washington, Mayor, *et al.*, Defendants-Appellees (American Federation of State, County & Municipal Employees Union, Council 31, AFL-CIO, Intervenor)).

First District (5th Division)   No. 84—1433

Opinion filed August 31, 1984.

Sherman Carmell, of Carmell, Charone & Widmer, Ltd., and Jack P. Cerone, of Erbacci, Syracuse & Cerone, Ltd., both of Chicago, for appellants.

James D. Montgomery, Corporation Counsel, of Chicago (Jerome A. Siegan, Mary K. Rochford, and Anthony E. Dombrow, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

Gilbert A. Cornfield and Stephen A. Yokich, both of Cornfield and Feldman, of Chicago, for appellee American Federation of State, County & Municipal Employees Union.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from a judgment in a consolidated action which declared lawful the city employee representation elections held pursuant to the election rules promulgated by the city of Chicago commissioner of personnel. The newly enacted Illinois Public Labor Relations Act (Public Labor Relations Act) (Ill. Ann. Stat., ch. 48, par. 1601 *et seq.* (Smith-Hurd 1984 Supp.)) took effect July 1, 1984, and totally preempts the field of collective bargaining for public employees. However, prior to the effective date of the Act, the city—through its department of personnel—divided the city employees into five bargaining units and, as a result, the American Federation of State, County & Municipal Employees Union, Council 31, AFL-CIO (AFSCME), became the exclusive representative of the city employees in all but one of the five bargaining units.

Appellant unions State & Municipal Teamsters, Chauffeurs & Helpers, Local 726; International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters); and Laborers International Union of North America, Locals 1001 and 1092 (Laborers), contend here that (1) the power of the city to conduct the elections was preempted by the Public Labor Relations Act; (2) the Personnel Code did not authorize the commissioner to enact election rules and conduct the elections; and (3) the rule-making procedure was deficient.

On February 28, 1984, the commissioner sent a letter to the Teamsters, the Laborers, and various other labor organizations, informing them that the city intended to conduct union representation elections for unrepresented city employees and had placed employees

in five bargaining units for purposes of the election. Those units were:

Unit 1 — Administrative and Clerical Employees

Unit 2 — Public Safety Employees

Unit 3 — Human Services and Inspection Employees

Unit 4 — Professional Employees

Unit 5 — Library Employees

The letter stated that rules for the elections would be available on March 1, 1984, through the department of personnel, and that the city would accept valid and timely petitions for representation and requests to intervene by unions in a particular election. The city received a number of responses to its announcement. AFSCME filed petitions for representation in Units 1, 3, 4, and 5 and intervened in Unit 2. The Chicago Crossing Guards Association, AFL-CIO (Crossing Guards); Local 165, International Brotherhood of Electrical Workers, AFL-CIO (IBEW); and Local 46, Service Employees International Union (SEIU), filed a joint petition for representation in Unit 2. Local 112(L) of the International Brotherhood of Carpenters Union (Local 112) threatened to pursue judicial remedies unless the city recognized Local 112 as the historical collective bargaining representative of certain city employees in Unit 3. The Teamsters and Laborers, in a letter from the Teamsters' attorneys dated April 5, 1984, demanded that the city rescind the February 28, 1984, notice and the elections rules. The letter raised essentially the same issues presented in this appeal. The Teamsters and Laborers, however, did not file a petition for representation or a request to intervene in any of the five units. After receiving the responses from the unions, the city scheduled elections in Units 1, 3, and 5 for May 3, 1984.

On April 18, the city filed a complaint against the above-mentioned unions and the Chicago Federation of Labor seeking a declaration as to the rights of the parties and the legality of the city's actions in establishing and conducting the representation elections. Motions to dismiss filed by the Chicago Federation of Labor, the Crossing Guards, SEIU, and IBEW, were allowed. Local 112 was also dismissed as a defendant, and its counterclaim and motion for injunctive relief were withdrawn after the city recognized Local 112 as the historical representative of certain employees. The Teamsters and Laborers filed answers and a joint motion for summary judgment. Edward M. Burke (Burke), an alderman of the city, was granted leave to intervene, and he also filed a motion for summary judgment.

The Teamsters and Laborers filed a separate action on April 18, seeking injunctive and declaratory relief against the mayor of the city and the commissioner. Alleging that the commissioner had exceeded

his authority and that the elections would deprive the Teamsters and Laborers of their rights under the new Public Labor Relations Act, the Teamsters and Laborers requested the court to enjoin the representation elections scheduled for May 3. On April 27, AFSCME was permitted to intervene as a party defendant in the case filed by the Teamsters and Laborers, and the two actions were then consolidated.

On April 30, the motion of the Teamsters and Laborers for a temporary restraining order was denied, as were the motions for summary judgment. The trial court also held that the Public Labor Relations Act did not preempt the area until the effective date of the Act—July 1, 1984—and that the commissioner's actions were impliedly authorized by chapter 25.1 of the Municipal Code. The city's motion for declaratory relief was denied on the basis that the department of personnel had failed to give proper notice of the proposed rules. The court then granted the motion of the Teamsters to impound the ballots.

On May 1, after the commissioner announced his decision to republish the election rules and to reschedule the elections for a later date in order to comply with the publication requirement of section 25.1—5 of the Municipal Code, the trial court vacated its order impounding the ballots. The Teamsters and Laborers sent a letter to the commissioner containing their views on the appropriate determination of the bargaining units. After the commissioner responded to their comments, the elections in all five bargaining units were scheduled for June 5 and 6.

The Teamsters and Laborers then filed a petition for preliminary injunction, challenging the rule-making procedures followed by the commissioner. Prior thereto and after the dismissal in this court of their interlocutory appeal of the denial of their motion for a temporary restraining order, the Teamsters and Laborers filed—on June 1—an amended petition for a preliminary injunction which reasserted their earlier objections concerning the commissioner's authority. On June 4, the trial court denied the requests of the Teamsters and Laborers to enjoin the election, but did enjoin certification of the results until further order. The elections were then held on June 5 and 6.

On June 8, the trial court ordered the election results in Units 2 and 5 certified, since the Teamsters and Laborers did not object to the composition of those particular units. On June 11, it held that the commissioner's rule-making procedure was lawful, and a final order was entered which dismissed the complaint of the Teamsters and Laborers, denied its amended petition for preliminary injunction, granted the city's complaint for declaratory relief, and directed that

the election results be certified. This appeal followed.

OPINION

I

The Teamsters and Laborers first contend that the Public Labor Relations Act precluded the city from holding the representation elections by preempting the area of collective bargaining by public employees. The State legislature does have the power to preempt the exercise of certain home rule powers by providing for the exclusive exercise of such powers by the State. (Ill. Const. 1970, art. VII, sec. 6.) The parties agree that the Public Labor Relations Act included express language of preemption.

> "It is the public policy of this State, pursuant to paragraphs (h) and (i) of Section 6 of Article VII of the Illinois Constitution, that the provisions of this Act are the exclusive exercise by the State of powers and functions which might otherwise be exercised by home rule units. Such powers and functions may not be exercised concurrently, either directly or indirectly, by any unit of local government, including any home rule unit, except as otherwise authorized by this Act." Ill. Ann. Stat., ch. 48, par. 1615(c) (Smith-Hurd 1984 Supp.).

The Teamsters and Laborers maintain that the trial court erred in holding the Public Labor Relations Act's effective date of July 1, 1984, precludes the application of the preemption doctrine before that date. In support thereof, they cite much authority on the rules of statutory construction used to determine legislative intent. In particular, they argue that the Illinois Educational Labor Relations Act (Educational Labor Relations Act) (Ill. Ann. Stat., ch. 48, par. 1701 *et seq.* (Smith-Hurd 1984 Supp.)), effective January 1, 1984, and the Public Labor Relations Act, effective July 1, 1984, are *in pari materia* and should be construed together as one statute.

■ We reject this argument because rules of construction, including the rule of *in pari materia*, are not applicable. Initially, we note that such rules are not invoked unless the provision to be construed is ambiguous (*Kozak v. Retirement Board of Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 447 N.E.2d 394), and it appears clear that the effective date of the Public Labor Relations Act is unambiguous. Where the legislative intent can be ascertained, it must prevail and be given effect (*People ex rel. Mayfield v. City of Springfield* (1959), 16 Ill. 2d 609, 158 N.E.2d 582), and there is no rule of construction which authorizes a court to declare that the legislature did

not mean what the plain language of a statute imports. *City of Decatur v. German* (1923), 310 Ill. 591, 142 N.E. 252.

■ Moreover, the Illinois Constitution requires the General Assembly to *"provide specifically by law"* (emphasis added) when it wishes to effect exclusive preemption of a home rule power or function (Ill. Const. 1970, art. VII, sec. 6(h)), and section 7 of "An Act to revise the law in relation to the construction of the statutes" provides:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and *the language specifically sets forth* in what manner and *to what extent* it is a limitation or denial of the power or function of a home rule unit." (Emphasis added.) Ill. Rev. Stat. 1983, ch. 1, par. 1106.)

We cannot find an intent on the part of the legislature that the Public Labor Relations Act had preemptive effect as of January 1, 1984, as argued here, where no such intent was expressed in specific language. The city was therefore not precluded from holding the representation elections.

■ We also note that the Teamsters and Laborers argue that the above result will "countenance the infliction of great injury on non-educational employees." This harm is speculative to say the least. It is also worth noting that the result desired by the Teamsters and Laborers would have a much more tangible effect on the city employees. The employees could not even have begun the process of unionization until the State act became effective, a delay of over six months. It is therefore somewhat disingenuous of the Teamsters and Laborers to attempt to bolster their argument by referring to the "infliction of great injury on non-educational employees."

## II

### A. IMPLIED AUTHORITY

The Teamsters and Laborers next contend the commissioner was acting beyond the authority granted to him by the Personnel Code when he promulgated rules for and conducted the elections. They argue that section 25.1—2 of the Personnel Code lists the duties of the commissioner, and that section does not expressly authorize the commissioner to engage in collective bargaining. (Chicago, Ill., Municipal Code, ch. 25.1, par. 2 (1982).) Absent such an express authorization, the Teamsters and Laborers maintain that it is highly unlikely that

the city council intended to delegate the power to promulgate election rules to the commissioner. In support of this position, they refer us to proposed ordinances pending in the city council when the Personnel Code was passed, and to the fact that the legislative history of that code gives no indication of an intent to delegate rule-making authority to the commissioner. However, they do not inform us, and we fail to see, how the existence of proposed ordinances, which in some unspecified way refer to collective bargaining, or the nonexistence of legislative history give indication of a lack of intent on the part of the city council to have the commissioner perform the administrative type of functions at issue here.

■■ ■ We believe that a better indication of legislative intent can be found in a closer examination of the various sections of the Personnel Code. It is not necessary to find an express provision in the Personnel Code which authorizes the commissioner to set up the mechanics for the representation elections. "[A]n express legislative grant of power or authority to an administrative body or officer includes the grant of power to do all that is reasonably necessary to execute that power or authority." (*Parliament Insurance Co. v. Department of Revenue* (1977), 50 Ill. App. 3d 341, 347, 365 N.E.2d 667, 671.) It includes the authority which is incident to and included in the power expressly conferred for the purpose of effectively accomplishing the objectives for which the agency was created. (*Parliament Insurance Co. v. Department of Revenue* (1977), 50 Ill. App. 3d 341, 365 N.E.2d 667.) Thus, rather than focus on the express duties of the commissioner, we must also examine the purpose and objectives of the ordinance which created the department of personnel. In this regard, the Personnel Code states:

> "It is the general purpose of this ordinance, and it is necessary in the public interest, to establish a system of personnel administration that meets the social, economic, and program needs of the people of the City of Chicago, to provide for a professional and progressive merit system for employment and to insure flexible career service within the City of Chicago." (Chicago, Ill., Municipal Code, ch. 25.1, par. 1 (1982).)

The implementation of rules for representation elections is the type of function which would necessarily be performed by an administrative agency which is charged with establishing a system of personnel administration. In the Federal sector, the President established a labor management-relations system for Federal employees by executive order. The United States Supreme Court found statutory authorization for the executive order in 5 U.S.C. sec. 7301 (1982), which is a very

general grant of authority. It provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch." (5 U.S.C. sec. 7301 (1982).) The court held that the executive order was "plainly a reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch." (*Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 273 n.5, 41 L. Ed. 2d 745, 755 n.5, 94 S. Ct. 2770, 2776 n.5.) Here, the commissioner was authorized by the grant of power to establish an effective and efficient system of personnel administration. We hold that this grant of authority included the implied authority to establish rules and procedures for the representation elections.

Although analysis of the Personnel Code is not limited to the express duties of the commissioner, those express duties do refer to some of the same issues and problems covered by collective bargaining agreements. Among his other duties, the commissioner is specifically charged with fostering and developing programs "for the improvement of employee effectiveness including *but not limited to* position classification, salary administration, recruitment, selection, promotion, performance ratings, probationary periods, training, employee communications, employee benefits, affirmative action, safety and health." (Emphasis added.) (Chicago, Ill., Municipal Code, ch. 25.1, par. 2(3) (1982).) A system of personnel administration could be made more effective and employee effectiveness improved by the existence of a collective bargaining agreement which would deal with some of these concerns. The mere development of procedures for selection of a collective bargaining representative and the selection of bargaining units for purposes of the election is not beyond the implied power of the commissioner.

Additionally, the commissioner may also "perform any other lawful acts which may be necessary or *desirable* to carry out the *purposes* and provisions of this ordinance." (Emphasis added.) (Chicago, Ill., Municipal Code, ch. 25.1, par. 2(8) (1982).) The Teamsters and Laborers argue that this section refers only to the duties enumerated in section 25.1-2(1) through (7). However, we believe that section 25.1—2(8) refers specifically to the purpose of the ordinance and should therefore be read as a broad grant of authority to the commissioner, since it specifically grants to him the power to do what is desirable to establish an effective system of personnel administration. Such a reading of the grant of power is particularly appropriate here, since the ordinance refers not only to what is necessary but also to what is merely desirable.

■ Various other sections of the Personnel Code lend further support to the implied authority of the commissioner. The ordinance also created the Personnel Board. The Board is to provide advice and counsel to the Mayor and to the commissioner on *"all aspects* of public personnel administration including, *but not limited to,* manpower utilization, manpower training, employee grievances and employee salaries." (Emphasis added.) (Chicago, Ill., Municipal Code, ch. 25.1, par. 4 (1982).) This section again indicates that some of the very areas of concern in a collective-bargaining agreement are express areas of responsibility for the commissioner under this ordinance.

Furthermore, the commissioner is directed by the ordinance to issue rules on various aspects of personnel administration, including employee safety, health, discipline, and relations in general. He may also issue personnel rules which provide "[f]or such other policies and administrative regulations, not inconsistent with this law, as may be proper and necessary for its enforcement." (Chicago, Ill., Municipal Code, ch. 25.1, par. 5(15) (1982).) This general provision for rules also supports a finding of implied authority on the part of the commissioner to enact the election rules.

■ Where a legislative body uses language such as "all aspects of public personnel administration" and where the ordinance being interpreted was amended as recently as 1982, it is difficult to imagine that the city council did not contemplate the eventual institution of collective bargaining for public employees. With this perspective in mind, and in the absence of an express limitation on the commissioner's power, it is reasonable to conclude that the city council intended the commissioner to handle the necessary administrative details and procedures. Indeed, the rule of construction which extends a grant of power by implication is most often applied where powers are delegated to public officers or administrative agencies, because those implied powers may involve many functions which are discoverable only through practical experience. 2A A. Sutherland, Statutory Construction sec. 55.04 (1972).

After considering the ordinance as a whole, we find that the acts of the commissioner were within limits relevant to the purpose of the ordinance—the establishment of an effective system of personnel administration. We therefore hold that the acts of the commissioner were lawful and within the authority granted to him by Chapter 25.1 of the Municipal Code.

## B. Delegation

■ The Teamsters and Laborers also argue that the implied

power to promulgate the election rules is an unconstitutional delegation of legislative power. We hold that no delegation problem exists, for two reasons.

First, a distinction must be made between the delegation of true legislative power and delegation to a subordinate of the authority to execute the law. (*Hill v. Relyea* (1966), 34 Ill. 2d 552, 216 N.E.2d 795.) Although the Illinois Supreme Court has also expressed concern that mere characterization of action as administrative is not sufficient to eliminate a delegation problem, this concern was expressed in the context of administrative promulgation of regulations which prescribed rights and duties in a comprehensive regulatory scheme. (*Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 369 N.E.2d 875.) The enactment of the rules which established the procedures for the representation elections must be characterized as the exercise of a purely administrative function. Government would cease to function if nothing could be left to the discretion of administrative officers. *Mister Softee of Illinois, Inc. v. City of Chicago* (1963), 42 Ill. App. 2d 414, 192 N.E.2d 424.

Even where standards and guidelines are required, however, the precision of the standards "must necessarily vary according to the nature of the ultimate objective and the problems involved." (*Hill v. Relyea* (1966), 34 Ill. 2d 552, 555, 216 N.E.2d 795, 797.) In *Hill*, the legislature gave the superintendent of a State mental hospital the power to discharge patients "as the welfare of such person and of the community may require." Despite the substantial personal right involved, the court upheld the delegation as supported by adequate guidelines. The mandate here to "establish a system of personnel administration that meets the social, economic, and program needs of the People of the City of Chicago" is sufficient guidance to enable the commissioner to enact rules which are essentially procedural in nature.

Second, this is not true delegation of power. All parties agree that any collective-bargaining agreement must be approved by the city council, and it is therefore that body which actually determines the rights of the employees. Where final control remains in the legislative body, there is no delegation problem. (*People ex rel. Gutknecht v. City of Chicago* (1954), 3 Ill. 2d 539, 121 N.E.2d 791.) We also note that this court has previously observed the actual process of collective bargaining does not present a delegation problem. As stated in *Chicago Division of Illinois Education Association v. Board of Education* (1966), 76 Ill. App. 2d 456, 472, 222 N.E.2d 243, 251, quoting *Fellows v. LaTronica* (1962), 151 Colo. 300, 307, 377 P.2d 547, 551:

"The fact that the municipality engages in collective bargaining does not necessarily mean that it has surrendered its decision making authority with respect to public employment. The final decision as to what terms and conditions of employment the municipality will agree to, or whether it will agree at all, still rests solely with its legislative body."

If the collective-bargaining process itself is not unconstitutional delegation of power, the power to establish the rules for the elections cannot be unconstitutional delegation.

### C. NECESSITY OF ORDINANCE

■■ The Teamsters and Laborers next argue that the city council must "provide by ordinance in regard to the relation between all municipal officers and employees in respect to each other, the municipality, and the people." (Ill. Rev. Stat. (1983, ch. 24, par. 10—4—1.) Thus, they maintain that the type of action taken by the commissioner may only be done when specifically authorized by ordinance, since it affects the relations between the city and its employees.

Initially, the relations between the city and its employees will be changed by the collective-bargaining agreement itself, which must be approved by ordinance. Additionally, the limitation indicated by the Teamsters and Laborers is not applicable to the city. Section 10—4—1 is a general grant of authority to municipalities and was enacted before the 1970 Illinois Constitution. (*Redemske v. Village of Romeoville* (1980), 85 Ill. App. 3d 286, 406 N.E.2d 602; Ill. Rev. Stat. 1983, ch. 24, par. 10—4—1.) The city, as a home rule unit of government, may now exercise any power and perform any function pertaining to its government and affairs. (Ill. Const. 1970, art. VII, sec. 6(a).) Since the statute was enacted before the 1970 constitution, it cannot be construed as a limitation of home rule power and, indeed, it is subordinate to an ordinance enacted by the city pursuant to its home rule powers. (*Aurora Pizza Hut, Inc. v. Hayter* (1979), 79 Ill. App. 3d 1102, 398 N.E.2d 1150.) Section 10—4—1, therefore, does not require us to invalidate the election rules.

### D. NECESSITY OF A PRIOR APPROPRIATION

■■ We find no merit in the further contention that the rules are invalid because the contract with the American Arbitration Association for the conduct of the elections was made without a prior appropriation and is thus null and void, pursuant to section 8—1—7 of the Illinois Municipal Code (Ill. Rev. Stat. 1983, ch. 24, par. 8—1—7). First, the validity or invalidity of the contract with the American Ar-

bitration Association is irrelevant with respect to the issue of implied authority. Additionally, such an expenditure could be taken care of by using the operating budget of the department of personnel and is thus supported by a prior appropriation. Clearly, section 8—1—7 does not require a separate appropriation for every expenditure by an administrative agency.

### III

■■ ■ Finally, the Teamsters and Laborers contend that the rule-making procedure used by the commissioner was deficient. In essence, they posit that there should have been rule-making hearings. In this regard, although there was no ordinance requirement for such hearings and there has been no Illinois case dealing precisely with this question, the Teamsters and Laborers nevertheless maintain that the commissioner should have followed the requirement in section 5.01(a) of the Illinois Administrative Procedure Act (IAPA) (Ill. Rev. Stat. 1983, ch. 127, par. 1005.01(a)) that public hearings be held on proposed rule making. This is particularly so, they argue, because the Labor Relations Board, under the new Public Labor Relations Act, must conform its rule-making procedures to the requirements of IAPA. We will not, however, invalidate the rules here for failure to conform to the rule-making standard of IAPA, because (a) it is clear—and the Teamsters and Laborers agree—that IAPA does not cover the commissioner and (b) as pointed out above, the Public Labor Relation Act is not applicable here. Furthermore, we do not believe that due process accorded the right to a hearing on the rule making here. It has long been the general rule that due process does not require a hearing in the context of administrative rule making. (*Bi-Metallic Investment Co. v. State Board of Equalization* (1915), 239 U.S. 441, 60 L. Ed. 372, 36 S. Ct. 141.) Although the Teamsters and Laborers refer to two cases in which a rule-making procedure did require a hearing, we note that in both cases it was clearly held that no *constitutional* right to a hearing existed (*Alaska Steamship Co. v. Federal Maritime Com.* (9th Cir. 1966), 356 F.2d 59; *California Citizens Band Association v. United States* (9th Cir. 1967), 375 F.2d 43, *cert. denied* (1967), 389 U.S. 844, 19 L. Ed. 2d 112, 88 S. Ct. 96), and the hearings referred to in those cases were required by the relevant acts, which in *Alaska Steamship* was the Intercoastal Shipping Act, and in *California Citizens Band* was the Communications Act of 1934.

Here, the relevant act is the ordinance which does not require such a hearing, providing only for:

"[P]ublic notice in one or more newspapers of general circula-

tion, and in no case shall such publication be less than ten days before the effective date of the proposed rule or amendment to the rule. Such public notice shall include information concerning where the rules can be reviewed and where comments may be directed." Chicago, Ill., Municipal Code, ch. 25.1, par. 5 (1982).

Although the commissioner initially did not give the notice required by section 25.1—5, he later published the proposed rules as required and rescheduled the elections. The Teamsters and Laborers do not now argue noncompliance with the notice provision of the ordinance; in fact, they admit that the commissioner personally responded by letter to the comments sent by the Teamsters.

Thus, considering that the commissioner complied with the provisions of the ordinance, that due process did not require a hearing, and that the Illinois Administrative Procedure Act was not applicable, we find no support for the contention that the rule-making procedure here was deficient.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.